# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

_____

SCOTT PATRICK COLLINS,

                                      Plaintiff,

      v.                                     7:13-CV-412
                                             (GTS/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

_____

LAWRENCE D. HASSELER, ESQ., for Plaintiff
VERNON NORWOOD, SPECIAL ASS'T U.S. ATTORNEY, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

      This matter was referred to me for report and recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I. PROCEDURAL HISTORY

      On November 19, 2009, plaintiff "protectively filed"[1] an application for Social Security disability insurance benefits, and on November 24, 2009, he protectively filed an application for Supplemental Security Income ("SSI") benefits. (Administrative Transcript ("T.") 14, 90, 91, 196-200). Plaintiff alleged a disability onset date of November 9, 2009. (T. 14, 199, 216, 221). The claims were denied initially on March

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.

23, 2010.  (T. 14, 92-98).  At plaintiff's request, Administrative Law Judge ("ALJ")

John P. Ramos conducted a hearing on July 15, 2011, at which plaintiff and his wife

testified via a video connection.  (T. 14, 103, 54-88).  A supplemental video hearing

was conducted on December 9, 2011, at which Vocational Expert ("VE") David Festa

testified.  (T. 33-53).  On December 22, 2011, the ALJ issued a decision denying

benefits.  (T. 14-26).  The ALJ's decision became the final decision of the

Commissioner when the Appeals Council denied plaintiff's request for review on

March 18, 2013.  (T. 1-7).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI

disability benefits must establish that he/she is "unable to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than twelve months . . . ."  42 U.S.C. §

1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process to evaluate disability insurance and

SSI disability claims.

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. § 404.1520 (disability insurance benefits) & § 416.920 (SSI). The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B.  Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing, *inter alia*, Johnson *v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his/her findings with sufficient specificity to allow a court to

determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *Williams*, 859 F.2d at 258.

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id.*

*See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## III.   FACTS

Plaintiff, born in late 1979, attended BOCES classes for vehicle maintenance and completed high school. (T. 58-59). Plaintiff had prior work experience including as a clerk at an automobile supply store, a car detailer at a dealership, a delivery driver for meals on wheels, a janitor at an adult home and a hospital, and a truck loader at a food warehouse. (R. 222, 243-49). In November 2009, at the age of 29, plaintiff had brain surgery for a right frontal intracerebral hemorrhage secondary to a ruptured anterior communicating artery aneurysm. (T. 299-300). He claims disability based upon resulting physical limitations, cognitive dysfunction, chronic headaches, vertigo, and anxiety. (R. 216, 220, 260, 264).

Plaintiff's brief (at 1-11, Dkt. No. 13) provides a detailed summary of the medical and other evidence of record, which the defendant's brief (at 2-9, Dkt. No. 14), adopts, "with the exception of any inferences, suggestions, or arguments," and supplements. The medical and other factual evidence is also discussed extensively in the ALJ's decision, summarized below. (T. 17-19, 20-24). Rather than rehash the evidence in this case at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV.   ALJ's DECISION

The ALJ found that plaintiff met the insured status requirement of the Social Security Act through June 30, 2012. (T. 16). The ALJ determined that plaintiff had not engaged in "substantial gainful activity" since the alleged onset date of November 9, 2009. (T. 16).

The ALJ found that plaintiff had a severe impairment of "status post brain aneurysm." (T. 16-19). He reviewed the medical evidence indicating that plaintiff's brain surgery successfully secured the aneurysm and eliminated the worry about further cerebral hemorrhaging, but noted that testing revealed development of early encephalmomalacia–softening or loss of brain tissue.[2] The ALJ referenced various post-aneurysm symptoms for which plaintiff was treated, including cognitive dysfunction; headaches; dizziness; sleep issues; and head, neck, and abdominal pain associated with the ventriculoperitoneal ("VP") shunt implanted after the surgery to address the aneurysm. (T. 17-19).

The ALJ found plaintiff did not have an impairment or combination of impairments that met or medically equaled a listing under the regulations. (T. 19). In evaluating plaintiff's mental impairments at step three of the sequential analysis, the ALJ determined plaintiff had mild restrictions or difficulties in activities of daily living and social functioning; moderate difficulties in the maintaining concentration, persistence, and pace; and no episodes of extended decompensation. (T. 19).

"After careful consideration" of all of the medical and other evidence, the ALJ determined plaintiff had the RFC to perform unskilled or simple sedentary work, in that he could sit for six hours in an eight-hour workday; stand and/or walk for two hours in an eight-hour workday; and lift/carry and push/pull ten pounds occasionally. (T. 19-24). The ALJ determined that plaintiff should never balance, or climb ramps, ladders or scaffolds. (T. 19). Further, the ALJ found that plaintiff was able to understand and

---

[2] *See* http://www.ncbi.nlm.nih.gov/pubmed/22134284.

follow simple instructions and directions; perform simple tasks with supervision and independently; maintain attention/concentration for simple tasks; regularly attend to a routine and maintain a schedule; relate to and interact appropriately with others to the extent necessary to carry out simple tasks; and handle reasonable levels of simple, repetitive work-related stress in a stable environment requiring only occasional simple decision making related to performing simple tasks. (T. 19-20). The ALJ discussed, at length, the relative weight that he gave to the sometimes conflicting medical evidence in reaching his RFC determination. (T. 20-24). He evaluated the credibility of plaintiff's subjective complaints pursuant to the two-step process set forth in the applicable regulations (T. 20), concluding that, although plaintiff's impairments could reasonably be expected to cause the alleged symptoms, his statements regarding the intensity, persistence, and limiting effects of those symptoms were not credible to the extent inconsistent with the ALJ's RFC determination. (T. 23-24).

The ALJ found that plaintiff was not capable of performing any past relevant work, but concluded, based on the testimony of the VE, that jobs existed in significant numbers in the national economy that plaintiff could perform. (T. 24-25). The ALJ ultimately determined that plaintiff had not been disabled from November 9, 2009 through the date of the decision. (T. 25-26).

## V.    ISSUES IN CONTENTION

The plaintiff makes the following arguments:

(1)    The Commissioner failed to consider whether the plaintiff's functional limitations met or equaled Listing 12.05(C) (Mental retardation). (Pl.'s Br. at 17-19).

(2)　　The Commissioner failed to properly determine plaintiff's RFC, in part by mis-applying the treating physician rule. (Pl.'s Br. at 19-24).

(3)　　Because his RFC determination was not supported by substantial evidence, the Commissioner erroneously found that jobs exist in significant numbers in the national economy that plaintiff could perform. (Pl.'s Br. at 24-25).[3]

Defendant argues that plaintiff's impairments did not meet or equal the mental retardation listing, in part because plaintiff's cognitive limitations were the result of his aneurysm and did not manifest themselves before his 22nd birthday. (Def.'s Br. at 13-14). The Commissioner contends that, in determining the plaintiff's RFC, the ALJ properly weighed the conflicting medical evidence and appropriately evaluated plaintiff's credibility. (Def.'s Br. at 14-22). Because the ALJ's RFC determination was supported by substantial evidence, defendants contend that he properly concluded that there was work existing in significant numbers in the economy which plaintiff could perform.　(Def.'s Br. at 22-24). This court agrees with the defendants and recommends dismissal of plaintiff's complaint.

## VI.　THE MENTAL RETARDATION LISTING

### A.　Applicable Law

At step three of the disability analysis, the ALJ must determine if plaintiff suffers from a listed impairment. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). It is the plaintiff's burden to establish that his or her medical condition or conditions meet *all* of the specific medical criteria of particular listed impairments. *Pratt v. Astrue,* No. 7:06-CV-551 (LEK/DRH), 2008 WL 2594430 at *6

---

[3] The issues articulated by plaintiff's counsel have been reorganized to facilitate their analysis below.

(N.D.N.Y. June 27, 2008) *citing Sullivan v. Zebley,* 493 U.S. 521, 530 (1990). If a plaintiff's "impairment 'manifests only some of those criteria, no matter how severely,' such impairment does not qualify." *Id.* In order to demonstrate medical equivalence, a plaintiff "must present medical findings equal in severity to *all* the criteria for the *one* most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. at 531 (emphasis added).

## B.    Analysis

The plaintiff argues that the ALJ erred in his step-three analysis by not considering whether the plaintiff met the requirements of Listing 12.05(C) for mental retardation. Listing 12.05 states in pertinent part:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements of A, B, C, or D are satisfied.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. To meet Listing 12.05, a claimant must satisfy the diagnostic description in the quoted introductory paragraph, in addition to the criteria in any one of the four subparagraphs that follow. *Douglass v. Astrue*, 496 F. App'x 154, 157 (2d Cir. 2012); 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(A) ("If your impairment satisfied the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets [Listing 12.05]."). The additional criteria for subsection 12.05(C) are:

> A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related

limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C).[4]

Plaintiff offers no evidence to contradict the finding of consultative, examining psychologist Dennis M. Noia, Ph. D., that the onset of plaintiff's cognitive limitations, as reflected, *inter alia*, by his full scale IQ of 63, began following his aneurysm, at age 29. (Pl.'s Br. at 18, T. 518).[5] To be deemed disabled under Listing 12.05, the plaintiff must "establish that he had related 'deficits in adaptive functioning' that arose prior to age 22 'from [his] cognitive limitations, rather than from a physical ailment or other infirmity.'" *Webb v. Colvin*, No. 12-CV-753S, 2013 WL 5347563, at *4 (W.D.N.Y.

---

[4] To establish that a claimant meets the requirements of Listing 12.05(C) for mental retardation, as opposed to the listings for other mental impairments, it is **not** necessary to prove that he or she satisfies the "paragraph B" criteria of 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C), by establishing at least two of the following: **marked** restrictions in activities of daily living; **marked** difficulties in maintaining social functioning; **marked** difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. *See Douglass v. Astrue*, 496 F. App'x at 157 (Listing 12.05 has a structure that is different from that of the other mental disorders listings); *Mendez v. Astrue*, No. 11-CV-276S, 2012 WL 3095587, at *4 (W.D.N.Y. July 30, 2012) (the analysis of whether a claimant has "marked restrictions" in daily living, social functioning, and concentration "is not necessarily transferable to the introductory paragraph of § 12.05, which does not require 'marked restrictions' but simply 'deficits in adaptive functioning.'").

[5] It would be reasonable to presume that plaintiff's low IQ and cognitive deficits manifested before age 22, **if** there was an absence of alleged evidence of any brain trauma or other injury that affected his cognitive functioning. *See Brown v. Astrue*, No. 5:11-CV-852, 2013 WL 74244, at *7 (N.D.N.Y. Jan. 4, 2013). In this case however, the medical evidence clearly indicates that plaintiff, at age 29, suffered damage to an area of the brain that affects cognitive functions, as a result of an aneurysm and cerebral hemorrhage. (T. 429-31). Moreover, plaintiff's personal history, including his completion of high school and his prior job history, further negate any possible inference that the cognitive limitations observed after his aneurysm had manifested themselves before age 22. *See, e.g., Edwards v. Astrue*, No. 5:07-CV-898 (NAM/DEP), 2010 WL 3701776, at *4 (N.D.N.Y. Sept. 16, 2010) (based upon the evidence, *inter alia*, that plaintiff had a high school education and a significant prior job history as a harvest worker and janitor, it is apparent that plaintiff "does not suffer from an impairment beginning before age 22 that meets the introductory paragraph of Listing 12.05").

Sept. 23, 2013) (citing *Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012)).  Given

that listing 12.05 clearly did not apply to this plaintiff, the ALJ's failure to explicitly

reference that section in his step-three analysis was not error, or was harmless.  *See,*

*e.g., Santiago v. Astrue*, No. 3:10-CV-937, 2011 WL 4460286, at *2, 3 (D. Conn. Mar.

15, 2011) (it was unnecessary for the ALJ's to consider the application of listing 12.05

to a plaintiff suffering from, *inter alia*, post motor vehicle traumatic brain injury,

because "the record is entirely void of any evidence to support the finding that the

subaverage general intellectual functioning had manifested before he was twenty-two

years old, which is the preliminary requirement of the listing).

## VII.  RFC/TREATING PHYSICIAN/CREDIBILITY

### A.  Applicable Law

#### 1.  RFC

In rendering a residual functional capacity (RFC) determination, the ALJ must

consider objective medical facts, diagnoses and medical opinions based on such facts,

as well as a plaintiff's subjective symptoms, including pain and descriptions of other

limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d

145, 150 (N.D.N.Y. 1999).  An ALJ must specify the functions plaintiff is capable of

performing, and may not simply make conclusory statements regarding a plaintiff's

capacities.  *Id.* (citing, *inter alia*, *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir.

1984)).  RFC can only be established when there is substantial evidence of each

physical requirement listed in the regulations.  *Id.*  (citing *LaPorta v. Bowen*, 737 F.

Supp. 180, 183 (N.D.N.Y. 1990)).  The RFC assessment must also include a narrative

discussion, describing how the evidence supports the ALJ's conclusions, citing

specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120 (DNH/GHL), 2010 WL 3825629, at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

It is well-settled that the combined effect of all plaintiff's impairments, must be considered in determining disability. *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995). The ALJ must evaluate the combined effect of plaintiff's impairments on his/her ability to work, "regardless of whether every impairment is severe." *Id.*

### 2. Treating Physician

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that a report of a treating physician is rejected. *Id.* An ALJ may not arbitrarily substitute his/her own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 3. Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v.*

*Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858 (RSP/GJD), 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.  20 C.F.R. §§ 404.1529(c), 416.929 (c).  When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

## B.      Analysis

### 1.      Medical Evidence

#### a.      Cognitive Limitations

On November 10, 2009, neurosurgeon Eric M. Deshaies, M.D., performed a coil embolization of plaintiff's anterior communicating artery aneurysm, and on November 23rd, he implanted a right frontal VP shunt to drain fluid from the plaintiff's brain.  (T. 299-300).[6]  Dr. Deshaies saw plaintiff on June 25, 2010, and reported that plaintiff's aneurysm was secured, and that he need not worry about further cerebral bleeding. The neurosurgeon noted that, as a result of the hemorrhage associated with the ruptured aneurysm, plaintiff developed encephalmomalacia (or tissue loss/softening) in the right frontal lobe of his brain–"the center of cognition, concentration, and temperament."  (T. 429).  The neurosurgeon found that plaintiff was "physically capable of doing everything he was before the surgery and the aneurysm rupture," but had significant cognitive impairment[7] and was, at that point in time, "totally disabled." The doctor stated that "[i]t is possible that with extensive rehabilitation [plaintiff's] disability may be reduced over the next couple of years."  (T. 430-31).[8]

---

[6] After a follow-up examination on February 12, 2010, Dr. Deshaies reported that the treatment of the aneurysm had been successful, and that plaintiff was doing well enough that he could slowly start returning to work, although he was experiencing some forgetfulness, weakness, and fatigue.  (T. 377-78).

[7] Dr. Deshaies noted that plaintiff had complained of problems concentrating, decreased patience, increased anxiety, and poor memory.  (T. 429).

[8] Dr. Deshaies' "Final Report" on January 25, 2011 stated that follow-up angiography showed no residual or recurrent aneurysms or other vascular malformations.  He referred plaintiff to a traumatic brain injury clinic "to help him with his short-term memory problems and cognitive rehabilitation."  (T. 490-91).

Plaintiff argues that the ALJ erred by giving "little weight" to the June 2010 opinion of Dr. Deshaies that plaintiff was "totally disabled" as a result of cognitive impairments. (Pl.'s Br. at 21; T. 20-21). However, as the ALJ noted (T. 20-21), the Commissioner is responsible for making the ultimate determination of whether a claimant is "disabled." *See Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.") (citing 20 C.F.R. § 404.1527(e)(1)).[9] In limiting the weight he gave to Dr. Deshaies' broad conclusion, which appeared to be based primarily on plaintiff's complaints regarding his symptoms, the ALJ reasonably relied on the fact that the neurosurgeon provided little or no treatment of plaintiff's complaints of cognitive disabilities, but merely referred him to other specialists for that purpose. (T. 21). The ALJ plaintiff appropriately gave significant weight to the contrary opinion of consultative, examining psychologist Dennis Noia, Ph. D., whose training and education focused on the evaluation and treatment of cognitive limitations, and who conducted specialized testing in evaluating plaintiff's intelligence and cognitive functions. (T. 516-21). *See, e.g., Britton v. Astrue*, No. 5:06-CV-639 (LEK), 2011 WL 2267587, at *14-15 (N.D.N.Y. June 7, 2011) (in evaluating conflicting medical opinions regarding plaintiff's cognitive functioning, the ALJ properly deferred to the opinion of a qualified consulting psychiatrist who specializes in cognitive functioning and mental evaluation over that of a treating doctor with a speciality in digestive

---

[9] This section of the regulations has since been renumbered as § 404.1527(d)(1).

15

diseases and disorders)[10] (citing 20 C.F.R. § 416.927(d)(5))[11] ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist . . .")). *See also Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) (the opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute such evidence) (citing, *inter alia*, *Miles v. Harris*, 644 F.2d 122, 124 (2d Cir. 1981)).

Dr. Noia evaluated plaintiff on August 26, 2011, observing, *inter alia*, that plaintiff recalled and understood instructions; he responded in a deliberate, orderly, and self-correcting manner; he worked with reflection and deliberation, but appeared to take an extended amount of time to process information; his attention and concentration were good; and he was cooperative and comfortable and did not evidence significant emotional distress. (T. 516-17). He administered the Wechsler Adult Intelligence Scale-IV (WAISIV) intelligence measure, and plaintiff achieved a full scale IQ score of 63, a processing speed score of 65, a working memory score of 69, a perceptual reasoning score of 71, and a verbal comprehension score of 71. (T. 518). Dr. Noia stated that the overall testing results suggested that plaintiff was functioning within the mild mental retardation range of intelligence, but he opined that the onset of plaintiff's cognitive issues began following his aneurysm. (T. 518).

---

[10] The *Britton* court also discounted the opinion of another physician, which "was not one deduced after any emotional, mental, or psychological testing, but was merely a repetition of past diagnoses." *Id.* at *15.

[11] This section of the regulations has since been renumbered as 20 C.F.R. § 416.927(c)(5).

Plaintiff reported to Dr. Noia that, on a regular basis, he dressed, bathed, and groomed himself, and that he cooked, cleaned, washed laundry, watched television, listened to the radio, drove, and got along well with friends and family. (T. 520). Plaintiff stated that he neither shopped, used public transportation, nor managed money. (T. 520).

Dr. Noia concluded that plaintiff could understand and follow simple instructions and directions; perform simple and some complex tasks with supervision and independently; maintain attention and concentration for tasks; regularly attend to a routine and maintain a schedule; learn new tasks; make appropriate decisions; relate to and interact moderately well with others; and deal with stress. (T. 520). Dr. Noia diagnosed a cognitive disorder following aneurysm. (T. 520).

Dr. Noia also completed a medical source statement regarding plaintiff's mental ability to do work-related activities on September 6, 2011. (T. 522-25). He concluded that plaintiff had no significant limitations in understanding, remembering, and carrying out simple instructions; in making judgment on simple work-related decisions; or in interacting appropriately with the public, supervisors, and co-workers. (T. 522-23). Plaintiff had a mild-to-moderate limitation in responding appropriately to usual work situations and changes in a routine work setting, as well as in several areas involving complex instructions and making judgments on complex work-related decisions. (T. 522-23). Dr. Noia found that plaintiff could manage benefits in his own best interests. (T. 524).

The ALJ's determination that plaintiff was capable of performing simple or unskilled sedentary work was "taken . . . more or less directly" from the August 2011

opinions of Dr. Noia and neurologic consultative examiner, Dr. Magurno.[12] (T. 23).

The performance of unskilled work requires that a claimant be able to understand, carry out, and remember simple instructions; make judgments with respect to simple work-related decisions; respond appropriately to supervision, co-workers, and usual work situations; and deal with changes in a routine work setting. 20 C.F.R. §§ 404.1545(c), 416.945(c); SSR 85-15, 1985 WL 56857, at *4; SSR 96-9p, 1996 WL 374185, at *8, 9. The conclusions of the ALJ and Dr. Noia regarding the scope of the limitations arising from plaintiff's cognitive issues are supported by substantial evidence because they are generally consistent with the medical evidence of record, other than Dr. Deshaies' conclusory June 2010 opinion that plaintiff's cognitive impairments were "totally" disabling. *See, e.g., Britton v. Astrue*, 2011 WL 2267587, at *15 (substantial evidence supports the ALJ's findings that a treating physician's opinion regarding plaintiff's cognitive functioning should be discounted and a consulting psychologist's opinion should be accorded the most weight, in part because the treating doctor's opinion is the exception to the record, which contains medical assessments and opinions consistently indicating that plaintiff is not disabled).

Plaintiff was seen three times at the outpatient rehabilitation service at Upstate University Hospital–twice by Nurse Practitioner ("NP") Paul Trela, in August 2010 and March 2011 and once by psychologist Angelina Rodner, Ph. D. in October 2010.

---

[12] Dr. Magurno, although he focused on plaintiff's physical limitations, found that plaintiff's mood and affect were appropriate and that he had no suggestion of impairment in insight or judgment. (T. 513). Plaintiff reported to Dr. Magurno that he did some cooking, cleaning, laundry, shopping, child care, showering, and dressing, and that he watched TV, listened to the radio, went out to the store, and socialized with friends. (T. 513). This confirms Dr. Noia's observation about the scope of plaintiff's daily activities and functional abilities.

(T. 21, 433-35, 492-99). After plaintiff's initial medical evaluation in August 2010, he was diagnosed by NP Trela with cognitive dysfunction post brain hemorrhage and referred to physical, occupational, and vocational therapy. NP Trela completed a medical source statement regarding plaintiff's mental ability to do work-related activities on March 3, 2011, in which Dr. Rodner "collaborated," based on her one prior examination of plaintiff. (T. 495-99). NP Trela found that plaintiff had a "fair" response to treatment as of March 2011, but a "poor" prognosis. (T. 496). The nurse practitioner opined that plaintiff had "moderate"[13] limitations in understanding, remembering, and carrying out simple instructions; but a "marked"[14] limitation in making judgments on simple work-related decisions. (T. 497).[15] Plaintiff was found to have a mild limitation in interacting appropriately with the general public and co-workers; as well as moderate limitations in interacting appropriately with supervisors; responding appropriately to usual work situations; and responding appropriately to changes in a routine work setting. (T. 498).

While the cognitive limitations assessed by Dr. Noia six months later were less restrictive than those found by NP Trela and Dr. Rodner, only their finding of a "marked" limitation in making judgments on simple work-related decisions was

---

[13] The evaluation form defined "moderate" as "more than a slight limitation . . . but the individual is still able to function satisfactorily." (T. 497).

[14] The evaluation formed defined "marked" as "a serious limitation" involving "a substantial loss in the ability to effectively function." (T. 497).

[15] NP Trela also found marked limitations in plaintiff's abilities with respect to "complex" instructions and making judgments on "complex work-related decisions. Given that the ALJ limited plaintiff to simple or unskilled work, these findings would not contradict the RFC determination. (T. 497).

inconsistent with the ALJ's RFC determination that plaintiff could do simple or unskilled sedentary work. The ALJ gave this aspect of NP Trela's opinion less weight than that of Dr. Noia because of the nurse practitioner's relative lack of expertise.[16] (T. 23). While the ALJ did not acknowledge that NP Trela's assessment was endorsed by Dr. Rodner, a qualified psychologist and an "acceptable medical source." SSR 06-03p, 2006 WL 2329939, at *1, Dr. Rodner only examined plaintiff once, so that her opinion was entitled to less weight, notwithstanding her status as a treating physician. 20 C.F.R. 20 C.F.R. §§ 404.1527(c)(2)(I), 416.927(c)(2)(I) ("the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion").[17] In any event, "conflicts in the medical evidence are for the Commissioner to resolve." *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). Given that Dr. Noia examined plaintiff more recently than NP Trela and Dr. Rodner, and given the scope of daily activities and functioning reported by plaintiff to Dr. Noia and Dr. Magurno, the ALJ's decision to credit Dr. Noia's conclusion that plaintiff's limitations with respect to judgments relating to simple work decisions were less

---

[16] Nurse practitioners are not "acceptable medical sources" under Social Security rulings; however, their opinions "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939, at *2.

[17] Dr. Rodner met with plaintiff and his wife for 75 minutes and did not appear to use any intelligence or other testing of the type subsequently administered by Dr. Noia. *See Galowitz v. Astrue*, No. 11 Civ. 2259, 2012 WL 4762563, at *12 (S.D.N.Y. Aug. 20, 2012) (the ALJ properly discounted a treating psychiatrist's opinion that plaintiff is "unable to work at this time or in the immediate foreseeable future" in part because it was inconsistent with the contrary opinion of a consulting psychologist which was supported by "specific, formalized, and well accepted testing instruments, and documented a level of mental ability which more accurately correlates with [Plaintiff's] extensive activity level).

extensive, is supported by substantial evidence. *See, e.g., Galowitz v. Astrue*, 2012 WL 4762563, at \*12 (affirming the ALJ's rejection of the treating psychiatrist's findings about the degree of plaintiff's limitations in various cognitive areas based on conflicts with the contrary findings of consulting psychologists or psychiatrists).

### b. Physical Limitations

As noted above, on June 25, 2010 neurosurgeon Eric M. Deshaies, M.D., reported that plaintiff was "physically capable of doing everything he was before the surgery and the aneurysm rupture," although he stated that plaintiff needed physical therapy. (T. 431).[18] On August 26, 2010, NP Trela referred plaintiff to physical therapy to help with his reported issues with dizziness and balance. (T. 434).

Physical therapist ("PT") Randy Lehman treated plaintiff between November 2010 and January 24, 2011, when he prepared a medical source statement regarding plaintiff's ability to do work-related physical activities. (T. 445-451). PT Lehman opined plaintiff was able to lift and/or carry up to ten pounds occasionally and frequently; stand and/or walk at least two hours in an eight-hour workday; and periodically alternate sitting and standing to relieve pain or discomfort. (T. 446-447) The physical therapist also found that plaintiff was limited in pushing and/or pulling in his upper and lower extremities, but could occasionally climb, balance, kneel, crouch, crawl, and stoop. (T. 447). PT Lehman reported that plaintiff was limited to

---

[18] In March 2010, medical consultant I. Seok, issued a physical RFC assessment indicating that plaintiff could perform work-related activities consistent with sedentary work. (T. 390-95). Dr. Seok's opinion appeared to be based primarily on the February 12, 2010 report of Dr. Deshaies that plaintiff was recovering from his brain surgery and could "slowly return to work." (T. 391).

occasionally reaching in all directions, handling and fingering. (T. 448). His functional capacity evaluation report opined that plaintiff was able to sit for 25 minutes, stand for 15 minutes, and intermittently stand, sit, and walk for 150 minutes. (T. 454). According to PT Lehman, plaintiff did not exhibit normal hand grip strength for his age and sex. (T. 454).

As noted, the ALJ found that plaintiff had the RFC to perform unskilled sedentary work. The full range of sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. §§ 404.1567(a), 416.967(a); SSR 96-9p, 1996 WL 374185, at *3. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about two hours of an eight-hour workday. Sitting would generally total about six hours of an eight-hour workday. SSR 96-9p, 1996 WL 374185, at *3. "Limitations or restrictions on the ability to push or pull will generally have little effect on the unskilled sedentary occupational base." *Id.* at *6.[19] However, "[m]ost unskilled sedentary jobs require good use of both hands and the fingers . . . ." *Id.* at *8.

As plaintiff's counsel argues (Pl.'s Br. at 23, 24), certain aspects of the PT Lehman's opinion–particularly those involving perceived limitations of plaintiff's ability to sit and reach, handle, and finger–did not support the ALJ's conclusion that

---

[19] "Postural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work." *Id.* at *7.

plaintiff could perform a full range of sedentary work. Although the ALJ gave the physical therapist's evaluation "some" weight, he found that, to the extent PT Lehman's opinions were inconsistent with the ALJ's RFC determination, they were not supported by the other medical evidence. (T. 23). Furthermore, as the ALJ correctly pointed out (T. 23), a physical therapist is not an acceptable medical source and, therefore, his opinion is not entitled to the deference accorded a treating physician. 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1); *Diaz v. Shalala*, 59 F.3d 307, 313, 314 (2d Cir. 1995) (the ALJ has the discretion to give the opinion of a non-acceptable medical the weight he believes it deserves based on the facts of the particular case).

In assessing plaintiff's physical functionality, the ALJ accorded greater weight to the August 2011 report of consultative examiner Justine Magurno, M.D., an "acceptable" medical source. (T. 22, 23). Dr. Magurno observed that plaintiff's gait was stiff, but otherwise normal. (T. 513). Plaintiff's station was normal and he could walk on heels and toes with no difficulty and without any assistive devices. Plaintiff had no difficulty changing for the examination, getting on and off the examination table, and rising from a seated position. (T. 513). Plaintiff's hand and finger dexterity was intact and he demonstrated full grip strength, bilaterally. (T. 513). Plaintiff demonstrated full muscle strength, as well as normal reflexes and sensations throughout his arms and legs. (R. 514).

Based on the findings from his neurologic examination, Dr. Magurno concluded that plaintiff could perform all work-related activities consistent with a full range of sedentary work. Specifically, Dr. Magurno found that plaintiff could lift and/or carry ten pounds occasionally and could sit for seven hours and stand and/or walk for four

hours, during the course of an eight-hour workday. (T. 526-27). The consultative examiner found that plaintiff could continuously reach in all directions, handle, finger, and feel. (R. 528). Plaintiff could occasionally push/pull as well as operate foot controls continuously. (T. 528). Particularly in light of the scope of the daily activities that plaintiff reported to Dr. Magurno and Dr. Noia, the ALJ did not err in according greater weight to the more recent neurologic examination of a qualified physician over the opinions of a physical therapist who last examined plaintiff 11 months before the ALJ's decision and who was not an "acceptable" medical source. *See, e.g., Cascio v. Astrue*, No. 10-CV-5666, 2012 WL 123275, at *2, 3 (E.D.N.Y. Jan. 17, 2012) (the ALJ considered the opinions of the physical therapists and, in light of the other medical evidence in the record–including the opinion of a consultative examiner–and the fact that physical therapist are not "acceptable medical sources," properly found that those opinions should not receive substantial weight); *Hemion v. Astrue*, No. 3:05-CV-674 (LEK/DEP), 2008 WL 833961, at *8 (N.D.N.Y. Mar. 27, 2008) (substantial evidence supported the ALJ's RFC determination, including his rejection of some conflicting medical evidence from a physical therapist regarding the plaintiff's ability to lift and sit).

## 2. Evaluation of Plaintiff's Credibility

The plaintiff testified at the July 2011 hearing that, due to his brain aneurysm, his memory "is not the greatest"; concentration issues prevent him from completing tasks like he used to; and his communication with family and others is not "as good." (T. 62-64). He complained of being moody and staying away from people, of suffering from anxiety and depression, and of problems sleeping because "his brain

doesn't shut off." (T. 62-64). Plaintiff claimed to have frequent headaches caused by "lifting something a little too heavy" or stress, which he treated with Tylenol. (T. 62, 71). He testified that he experienced pain along his ribs, where the VP shunt drained, and low back pain when he walks too much. (T. 65). Although he did not use a cane, plaintiff had difficulty balancing, and had fallen a couple of times. (T. 65).

Plaintiff stated that he could lift "roughly 10 to 15 pounds," could sit for "about a half hour," stand for "roughly an hour" if he adjusts his position, and walk "roughly a block" before taking a break. (T. 66-67). He acknowledged that he could bathe and dress himself; perform "very little" housework; "do a few loads of laundry once in awhile"; do "odds and ends" of yard work, but not mowing the lawn; supervise three children between ages five and ten all day; play with an energetic dog; and watch TV, although he remembered only part of what he watched. (T. 65, 67-69, 77). Plaintiff testified that he could drive a car on trips of a few miles, but preferred that others drive on long-distance trips. (T. 74-75). He claimed he was unable to reliably handle money. (T. 71). Plaintiff stated that he used a computer, mostly to research his medical issues. (T. 77).

Plaintiff's wife testified that her husband's memory was not so good, that he had "lots of difficulty" staying on task, and could not handle paying the bills or the check book, or shopping. (T. 80-81). She stated that plaintiff had high anxiety and irritability levels and difficulty coping with large groups of people or rambunctious children. (T. 79-80, 82). He suffered headaches "quite frequently." (T. 83, 87). Plaintiff's wife testified that her husband could drive, but only a short distance, and that he played Play Station and X-Box games. (T. 85, 86). Plaintiff oversaw the kids

25

when they were not in school and his wife was at work; but the kids also kept an eye on plaintiff. (T. 83-84, 86).

After evaluating the medical evidence and the plaintiff's statements about his daily activities before and after the hearing, the ALJ concluded that, although plaintiff's impairments could reasonably be expected to cause the alleged symptoms, his testimony regarding the intensity, persistence, and limiting effects of those symptoms were not credible to the extent inconsistent with the ALJ's RFC determination. (T. 23-24). As discussed above, the medical evidence of record provides substantial support for the ALJ's conclusions that plaintiff's residual physical and cognitive limitations following his brain surgery were not inconsistent with his ability to perform unskilled or simple sedentary work.[20] As the ALJ pointed out, claimant's description of his daily activities at the July 2011 hearing was significantly more limited than those given to Dr. Noia and Dr. Magurno approximately six weeks later (T. 24, 513, 520),[21] and those reflected on the disability report prepared by his wife in January 2010 (T. 24, 233-237).[22] I conclude that there was substantial evidence supporting the ALJ's conclusion regarding plaintiff's credibility.

---

[20] Plaintiff's occasional complaints of abdominal or other pain relating to his ventriculoperitoneal shunt were addressed, and no problems or defects in drainage system were detected. (*See, e.g.*, T. 368, 422, 441, 487-88, 489).

[21] For example, plaintiff told Dr. Noia in August 2011 that "he can cook and prepare food, do general cleaning, [and] laundry," "that he gets along well with friends and family," and that "[h]e spends his days doing some chores, spending time with family, watching television, and listening to the radio." (T. 520).

[22] The disability report stated, *inter alia*, that, during the day, plaintiff takes care of his children and pets, prepares quick and easy meals, does laundry, watches TV, talks on the phone and visits with friends at his house. *Id.*

## VIII. THE ALJ'S ANALYSIS AT STEP FIVE

### A. Legal Standards

At step five of the disability analysis, the burden of proof shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). But if plaintiff has non-exertional impairments, and if those non-exertional impairments "significantly limit the range of work" permitted by his exertional impairments, the ALJ may be required to consult a vocational expert (VE). *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986).

If the ALJ does use a VE, he presents the expert with a set of hypothetical facts to determine whether plaintiff retains the capacity to perform any specific job. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981). The ALJ may rely on a VE's testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect the plaintiff's limitations. *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009). Where the hypothetical is based on an ALJ's RFC analysis, which is supported by substantial facts, the hypothetical is proper. *See id.* at 276-277.

### B. Analysis

David Festa, an impartial vocational expert ("VE"), testified that an individual with plaintiff's vocational factors and the RFC determined by the ALJ could perform occupations which existed in significant numbers in the national economy. (T. 25,

27

44-46). VE Festa provided three examples of unskilled, sedentary occupations that someone with these hypothetical characteristics and abilities could perform–lens inserter (229,240 jobs nationally, 60 jobs regionally), final assembler (229,240 jobs nationally, 60 jobs regionally), and waxer (394,270 jobs nationally, 290 jobs regionally). (T. 25, 44-45).

Plaintiff's counsel argues, in essence, that because the ALJ erred in his step four analysis by improperly discounting medical evidence inconsistent with his RFC determination, the ALJ's hypothetical questions and the VE's testimony were similarly flawed. (Pl.'s Br. at 24-25). Because this court concludes that the ALJ's RFC analysis was proper, his RFC determination was supported by substantial evidence, and his hypothetical questions to the VE accurately tracked his RFC determination, the plaintiff's challenge to the step-five analysis must fail. *Calabrese v. Astrue*, 358 F. App'x at 276-77.

Plaintiff contends that the ALJ improperly ignored the VE's testimony that someone limited to no more than occasional handling, reaching, and fingering–a limitation that physical therapist Lehman found in plaintiff–could not perform most, if not all, unskilled sedentary work. (Pl.'s Brf at 24, T. 48-49). The ALJ is not required to submit to the vocational expert every limitation alleged by the claimant, but must only convey all of a claimant's credibly established limitations. As discussed above, the ALJ's decision to discount the more restrictive physical limitations assessed by PT Lehman was supported by substantial evidence. Accordingly, the ALJ was not required to consider the impact of such limitations in framing his hypothetical questions for the VE or assessing his opinions. *See Dumas v. Schweiker*, 712 F.2d

28

1545, 1553-54 & n.4 (2d Cir. 1983) (ALJ was not required to rely upon the testimony of the VE that a certain limitation would render a claimant incapable of performing particular work where the ALJ had properly discounted the credibility of the evidence that plaintiff suffered from that limitation).

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the plaintiff's complaint **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:   May 8, 2014

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**